# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JEFFREY LANPHERE,        )
                                )

        Plaintiff,       )
                                )

       v.             )       Civil Action No. 11-207 Erie
                                )

MICHAEL J. ASTRUE,     )       Judge Sean McLaughlin
COMMISSIONER OF SOCIAL  )       Magistrate Judge Susan Baxter
SECURITY,              )
                                )

        Defendant.     )


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is respectfully recommended that the Plaintiff's motion for summary judgment (*ECF No. 9*) be denied, that the Defendant's motion for summary judgment (*ECF No. 11*) be granted, and that the final decision of the Commissioner of Social Security be affirmed.


### II.    REPORT

#### A.    INTRODUCTION

Plaintiff Jeffrey Lanphere ("Lanphere") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act") [42 U.S.C. §§ 401-433, 1381-1383f]. The matter is presently before the Court on cross-motions for summary judgment filed by the parties pursuant to Federal Rule of

Civil Procedure 56. (ECF Nos. 9, 11). The arguments advanced by Lanphere in support of his motion for summary judgment are without merit.

### B.     PROCEDURAL HISTORY

During the fall of 2009, Lanphere suffered a seizure. (R. at 177). As a result of the seizure and accompanying medical condition, he was no longer able to drive an ambulance. (R. at 177). He stopped working on October 7, 2009. (R. at 177). Lanphere protectively applied for DIB and SSI benefits on October 30, 2009, alleging that he had become "disabled" on October 7, 2009. (R. at 148, 153). The applications were administratively denied on April 30, 2010. (R. at 97, 102). Lanphere responded on May 5, 2010, by filing a timely request for an administrative hearing, and on November 16, 2010, a hearing was held before Administrative Law Judge ("ALJ") Timothy M. McGuan. (R. at 32, 110). Lanphere, who was represented by counsel, appeared and testified at the hearing. (R. at 37-58, 73-75). Testimony was also taken from Aaron Atkins ("Atkins"), Lanphere's brother, and James Phillips ("Phillips"), an impartial vocational expert. (R. at 58-73). In a decision dated December 10, 2010, the ALJ determined that Lanphere was not "disabled" within the meaning of the Act. (R. at 16-31).

On January 18, 2011, Lanphere sought administrative review of the ALJ's decision by filing a timely request for review with the Appeals Council. (R. at 13-15). The Appeals Council denied the request for review on July 19, 2011, thereby making the ALJ's decision the "final decision" of the Commissioner in this case. (R. at 1). Lanphere commenced this action on September 16, 2011, seeking judicial review of the Commissioner's decision. (ECF Nos. 1, 2). Lanphere and the Commissioner filed motions for summary judgment on January 18, 2012, and

March 5, 2012, respectively. (ECF Nos. 9, 11). These motions are the subject of this report and recommendation, which is being filed pursuant to 28 U.S.C. § 636(b)(1)(C).


C.    STANDARD OF REVIEW

This Court's review is plenary with respect to all questions of law. *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of*

*Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions.  He or she must make specific findings of fact.  *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983).  The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence.  *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act.  The United States Supreme Court summarized this process by explaining:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."  [20 C.F.R.] §§ 404.1520(b), 416.920(b).  At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  §§ 404.1520(c), 416.920(c).  At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  §§ 404.1520(d), 416.920(d).  If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the

claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003)(footnotes omitted). Factual findings pertaining to all steps of the sequential evaluation process are subject to judicial review under the "substantial evidence" standard. *McCrea v. Commissioner of Social Security*, 370 F.3d 357, 360-361 (3d Cir. 2004).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, the Supreme Court explained:

[W]e [have] emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

332 U.S. 194, 196 (1947). The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

### D. THE ALJ'S DECISION

Lanphere sought benefits based upon a seizure disorder, a left shoulder injury, a learning disability, and the heart condition which led to two heart attacks. (R. 24, ALJ Opinion).

In his written opinion, the ALJ determined that Lanphere had not engaged in substantial gainful activity subsequent to his alleged onset date. (R. at 21). Lanphere was found to be suffering from a seizure disorder, a bipolar disorder, and myocardial infarctions and other cardiac conditions. (R. at 21). His seizure disorder and bipolar disorder were deemed to be "severe" under the Commissioner's regulations, while his alleged cardiac impairments were deemed to be "non-severe." (R. at 21-22); 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c). The ALJ concluded that Lanphere's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22-23).[1]

The ALJ opined that although he found that the claimant had "severe impairments be definition," he did not "find the claimant's allegations of total and continuing disability to be credible, supported by or consistent with the record as a whole." (R. 28).

The ALJ explained that the seizure disorder was not well documented, that Plaintiff had three seizures in his lifetime, and had been well maintained on medications. The ALJ cited portions of the record that indicated that Plaintiff had denied having a seizure disorder in an attempt to get his driver's license reinstated and that Plaintiff's primary care physician noted weak support for a seizure disorder and noted an inference that Plaintiff was not taking his anti-seizure medications as prescribed. Id.

---

[1] The ALJ's opinion does not mention the left shoulder injury or the learning disability. (R. 19-31).

The ALJ also pointed out inconsistencies in Plaintiff's testimony. Plaintiff testified that he had two myocardial infarctions, but the medical records did not support that and one of the episodes had specifically been ruled not a myocardial infarction. Plaintiff testified that he had a knee injury and a nerve removed, but the medical record did not support these statements.

The ALJ also noted that the medical record varied on reports from Lanphere as to why he stopped working as an EMT: "at times, he says because of his seizure disorder and at others, he says because he was laid off due to lack of work." Id. The ALJ relied on Lanphere's eligibility for unemployment compensation benefits as a basis for finding him capable of maintaining a full-time job, as he noted that in order to receive such benefits, an individual must certify that he is able to work. (R. at 29).[2]

In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ assessed Lanphere's "residual functional capacity"[3] as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: avoid even moderate exposure to heights and hazards; no climbing ropes, ladders and scaffolds; cannot understand, remember and carry out complex and detailed tasks and can occasionally interact with the public with no limits in interaction with co-workers or supervisors. He cannot read and write at a level greater than third grade level.

---

[2] In order to be eligible for unemployment compensation benefits under Pennsylvania law, an individual must be "able to work and available for suitable work." 43 PA. STAT. § 801(d)(1). Tracey Fowler ("Fowler"), a treating CRNP, reported on July 27, 2009, that Lanphere was collecting unemployment compensation benefits. (R. at 302). At the hearing before the ALJ, Lanphere confirmed that he was receiving unemployment compensation benefits. (R. at 57).

[3] The term "residual functional capacity" is defined as "that which an individual is still able to do despite the limitations caused by his or her impairments." *Hartranft v. Apfel*, 181 F.3d 358, 359, n. 1 (3d Cir. 1999)(parentheses omitted), citing 20 C.F.R. § 404.1545(a). The same residual functional capacity assessment is used at the fourth and fifth steps of the sequential evaluation process. 20 C.F.R. §§ 404.1545(a)(5)(i)-(ii), 416.945(a)(5)(i)-(ii).

(R. at 23). In addition to his experience as an emergency medical technician, Lanphere had "past relevant work"[4] experience as a general laborer. (R. at 65). Vocational Expert Phillips classified that position as an "unskilled"[5] job at the "heavy"[6] level of exertion. (R. at 65). In response to a hypothetical question describing an individual with the limitations contained in the ALJ's residual functional capacity assessment, Phillips testified that such an individual could work as a general laborer. (R. at 68). Consequently, the ALJ determined that Lanphere could return to his past relevant work. (R. at 29).

Lanphere was born on July 6, 1979, making him thirty years old on his alleged onset date and thirty-one years old on the date of the ALJ's decision. (R. at 30, 148, 153). He was classified as a "younger person" under the Commissioner's regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c). He had a "limited"[7] education and an ability to communicate in English. (R. at 37, 67, 176, 183); 20 C.F.R. §§ 404.1564(b)(3), (5), 416.964(b)(3), (5). Given the applicable residual functional capacity and vocational assessments, the ALJ alternatively concluded that Lanphere could work as an inspector-packer or a line packer. (R. at 30).

---

[4] "Past relevant work" is defined as "substantial gainful activity" performed by a claimant within the last fifteen years that lasted long enough for him or her to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). The Commissioner has promulgated comprehensive regulations governing the determination as to whether a claimant's work activity constitutes "substantial gainful activity." 20 C.F.R. §§ 404.1571-404.1576, 416.971-416.976.

[5] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, [the Commissioner] consider[s] jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs." 20 C.F.R. §§ 404.1568(a), 416.968(a).

[6] "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds." 20 C.F.R. §§ 404.1567(d), 416.967(d).

[7] The record indicates that Lanphere dropped out of school in 1999, after completing the eleventh grade. (R. at 37, 183). In his decision, the ALJ stated that Lanphere had "at least a high school education." (R. at 30). In his hypothetical question to the vocational expert, however, the ALJ correctly described Lanphere as an individual with a "limited" education. (R. at 67).

Vocational Expert Phillips' testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).[8]  (R. at 68-69).

### E.  THE EVIDENTIARY RECORD

#### 1)  PRIOR DISABILITY

During the course of his educational career, Lanphere was forced to repeat multiple grade levels multiple times.  (R. at 375).  Lanphere chose to withdraw from Bradford Area High School when he was in the eleventh grade, a decision influenced by the fact that he would have reached the age of twenty-one during his senior year.  (R. at 375).  Lanphere testified that he quit school after learning that he was not expected to pass.  (R. at 38).

Lanphere received DIB and SSI benefits for the period of time commencing on September 1, 2004, and ending on February 18, 2007.  (R. at 77-90).  Lanphere sought benefits based upon seizures of undetermined cause, rotator cuff tendonitis, adjustment disorder, and mild-to-moderate brain dysfunction.  His period of disability concluded on February 19, 2007, when he started to work as an emergency medical technician.  (R. at 89).  Lanphere sought treatment for psychiatric impairments (of depressive disorder and bipolar disorder) while he was receiving benefits.  (R. at 264-265, 303-321, 324-326).  He also received medical treatment for chest pains and seizures during that period of time.  (R. at 269-281, 292-296, 337-343, 357, 359-366).

#### 2)  CURRENT APPLICATION FOR BENEFITS

---

[8] At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy."  *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003).  This burden is commonly satisfied by means of vocational expert testimony.  *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

In support of Plaintiff's current request for benefits, Dr. Shelley, Lanphere's primary care physician, submitted medical evidence for the period from December of 2007 through November of 2009.

Lanphere was admitted to Bradford Medical Center on April 29, 2007 for suicidal ideation. Lanphere had been undergoing outpatient treatment at the Guidance Center and his Zoloft had been tapered off and discontinued. At the hospital, he was restarted on Zoloft, stabilized, and released. (R. 264-65).

On October 6, 2008, Lanphere presented to the emergency room with complaints of severe chest pain mimicking severe coronary artery disease. Lanphere was transferred to Rochester General Hospital and was assessed with chest pain, unstable angina and no evidence of any acute ischemic myocardial injury. He underwent a cardiac catheterization that showed fairly classic symptoms of micro-vascular coronary artery disease with slow flow syndrome. (R. 266-81).

Lanphere was seen for chest pain and intermittent numbness in his arm in the emergency room of Olean General Hospital on December 30, 2008. Lanphere reported that he had not been on any cardiac medications since his hospital visit in October of 2008. Myocardial infarction was ruled out and micro-vascular coronary artery disease was noted. Lanphere was discharged with medication and advised to see his primary care physician, Dr. Shelley. (R. 295-96).

During the summer of 2009, Lanphere underwent a two-day psychological evaluation as ordered by the Court of Common Pleas of McKean County, Pennsylvania, in order to assess his suitability to serve as the custodial parent of his young daughter, April. (R. at 282). The evaluation was performed by Dr. John W. Addis who concluded that Lanphere was "capable of raising his daughter." (R. at 291). The evaluation revealed that Lanphere was reading at the

level of a fifth-grader, spelling at the level of a fourth-grader, and solving arithmetic problems at the level of a seventh-grader. (R. at 288). In a written report discussing the findings of his evaluation, Dr. Addis stated as follows:

> Mr. Lanphere was found to have the basic ability to carry out instructions, perform activities within a schedule, attend to a simple task from beginning to end, sustain a specific routine, and make marginal to fair problem solving decisions. He is also able to adapt to change, and make decisions when under a mild to moderate amount of stress.

(R. at 289).

Lanphere experienced chest pains during the summer of 2009. (R. at 355, 353). An x-ray of his chest performed on July 9, 2009, indicated that "[n]o acute disease" could be identified. (R. at 355). On July 25, 2009, Lanphere arrived at Olean General Hospital in Olean, New York, complaining of a headache, vomiting, weakness, and intermittent numbness in his left arm and leg. (R. at 297-300). A computed tomography ("CT") scan of his brain yielded normal results. (R. at 354).

An x-ray of Lanphere's chest conducted on September 26, 2009, revealed that his heart was not enlarged, that his lungs were clear, and that he did not have pneumonia. (R. at 353).

On or around October 7, 2009, Lanphere started to "shak[e] all over" while sleeping with his girlfriend. (R. at 330). He reported to the emergency room at Bradford Hospital. (R. at 330). Dr. Michael F. Stalteri advised Lanphere that he had suffered a seizure and warned him not to drive until receiving medical clearance. (R. at 328). A CT scan of Lanphere's brain failed to disclose noticeable abnormalities. (R. at 352).

Megan Borger ("Borger"), a physician assistant affiliated with the Upper Allegheny Medical Center ("UAMC"), examined Lanphere on October 9, 2009. (R. at 336). The examination was conducted for the purpose of determining whether it was safe for Lanphere to

return to work following the seizure. (R. at 336). Borger noted that Lanphere has a history of seizures and that she suspected that he was not adhering to his medication regimen which included a prescription for Tegretol as she estimated he was about a month behind in requesting refills of the prescription. (R. at 336). She instructed him to refrain from working until his condition could be evaluated further. (R. at 336).

An electroencephalogram ("EEG") performed on October 23, 2009, failed to uncover evidence of "epileptiform discharges" and the record was normal. (R. at 331, 349). Lanphere testified that he had lost his job shortly after suffering the seizure[9]. (R. at 47-48).

Ruth Brewer ("Brewer"), a certified registered nurse practitioner ("CRNP") employed by the UAMC, examined Lanphere on November 13, 2009. (R. at 335). Lanphere complained of sinus pressure, ear pain, and pain in the "upper right quadrant" of his abdomen. (R. at 335). Lanphere was diagnosed with sinusitis, and suspecting that he was suffering from gallbladder disease, Brewer advised Lanphere that diagnostic testing could be pursued. (R. at 335).

Lanphere returned to Brewer's office on November 23, 2009, complaining of abdominal pain and vomiting. (R. at 334). On December 2, 2009, an ultrasound of Lanphere's gallbladder

---

[9] The circumstances surrounding the termination of Lanphere's employment as an emergency medical technician are somewhat ambiguous. When he applied for DIB and SSI benefits, Lanphere stated that he had been discharged "within two weeks" of his seizure. (R. at 177). During his consultative psychological evaluation with Dr. Poland, Lanphere described the termination of his employment as "an act of discrimination." (R. at 375). When questioned about the matter at the hearing, Lanphere testified that he had been "let go" roughly two weeks after experiencing the seizure, stating that his employer had told him that "there was no work available." (R. at 47-48). A careful reading of the hearing transcript reveals that Atkins (Lanphere's brother and a co-employee of the ambulance service) may have played a role in Lanphere's discharge. Atkins, who was directly involved with the relevant ambulance service, provided the following testimony when asked why Lanphere had lost his job:

A.   He had some mental issues and when he came to return, we thought it was in the best interest to just replace him with someone else.

Q.   And what was the [INAUDIBLE] problem he had?

A.   As far as I'm under the understanding of was he had a seizure, as far as I know.

(R. at 63). In light of Atkins' testimony, it appears that there may have been a causal relationship between Lanphere's seizure and the termination of his employment.

was performed at the Bradford Regional Medical Center and indicated a stable gallbladder polyp, but no evidence of cholelithiasis. (R. at 347).

On March 10, 2010, Dr. Dilbagh Singh performed a consultative physical examination of Lanphere in connection with his applications for DIB and SSI benefits. (R. at 370-373). In his examination report, Dr. Singh observed that Lanphere's seizure disorder was "stable." (R. at 372). It was further noted that while Lanphere typically used Zoloft to control his depression, he could no longer afford to pay for it. (R. at 372). The examination otherwise yielded normal results with no neurological or musculoskeletal deficits. (R. at 373).

Dr. Danielle Poland, a licensed psychologist, performed a consultative psychological evaluation of Lanphere on March 22, 2010. (R. at 374-381). Dr. Poland noted that Lanphere was seeking benefits related to "bipolar disorder, learning disorder, seizures and a heart condition." Id. In the portion of her evaluation report describing Lanphere's work-related abilities and limitations, Dr. Poland stated as follows:

> In completing the medical source statement of ability to do work-related activities, it appeared that Mr. Lanphere exhibits slight impairment in his ability to understand, remember, and carry out short, simple instructions. In contrast, he exhibited moderate-to-marked impairment in his ability to understand, remember, and carry out detailed instructions. It was this psychologist's opinion that Mr. Lanphere would exhibit marked impairment in his ability to make judgments on simple work-related decisions. In addition, he is likely to exhibit moderate impairment in his ability to interact appropriately with the public, supervisors, and coworkers. His ability to respond appropriately to work pressures in a usual work setting and to changes in routine work setting was [sic] considered to be in the moderate-to-marked range of impairment. He is not considered to be able to manage benefits in his own best interest related both to a history of impulsive spending consistent with bipolar disorder, as well as to intellectual and mathematical limitations.

(R. at 379). Dr. Poland summarized her review of the medical records and her examination of Lanphere:

Mr. Lanphere has some difficulty reporting to this psychologist the ways in which his difficulties and limitations related to learning disorders and seizure disorder currently impacts his daily living. He reported some variability in mood that seemed especially to be characterized by periods of depression. He did not report symptoms suggestive of bipolar disorder; however, he has reportedly been diagnosed with this in the past by his psychiatric nurse practitioner, Tracey Fowler, CRNP. Records from Bradford Regional Medical Center indicate he had been diagnosed with depressive disorder, not otherwise specified with a rule out diagnosis of major depressive disorder when admitted by Dr. Laroche, psychiatrist, in April 2007. It is also noteworthy that during Dr. Addis' evaluation of Mr. Lanphere in July of 2009, Mr. Lanphere did not qualify for a mood disorder diagnosis in Dr. Addis' professional opinion. Regardless of the specific mood disorder, Mr. Lanphere's depression does not seem to be adequately managed by medication alone. He has not reportedly participated at individual therapy for at least nine months. It is recommended that Mr. Lanphere return for outpatient counseling to assess with his depressive feelings. If Mr. Lanphere is to be awarded Disability benefits, it is this psychologist's professional opinion that he is unable to manage benefits in his own best interest to both to [sic] intellectual and psychological difficulties.

(R. 380).

Dr. Kurt Maas, a nonexamining medical consultant, opined on April 5, 2010, that Lanphere was physically capable of performing a range of "medium"[10] work activities involving only occasional climbing of ramps and stairs, no climbing of ladders, ropes or scaffolds, and no concentrated exposure to temperature extremes. (R. at 382-388).

Francis Murphy ("Murphy"), a nonexamining psychological consultant, found Lanphere to be only "[m]oderately [l]imited" in his abilities to "maintain attention and concentration for extended periods" of time, to "complete a normal workday and workweek without interruptions from psychologically based symptoms," and to "perform at a consistent pace without an unreasonable number and length of rest periods." (R. at 390). In a consultative assessment dated April 28, 2010, Murphy stated that Lanphere was "able to meet the basic mental demands of

---

[10] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

competitive work on a sustained basis despite the limitations resulting from his [mental] impairment." (R. at 391).

## F. DISCUSSION

In his motion for summary judgment, Plaintiff Lanphere argues: 1) the ALJ erred because he failed to take into account the substantial medical and vocational evidence, as well as Lanphere's testimony, that he was unable to engage in any gainful activity on a competitive basis; and, 2) this case should be remanded for the submission of new evidence related to the progressive and worsening nature of Lanphere's seizure disorder, as well as documentation of his bi-polar disorder which the brief characterizes as a "new diagnosis." ECF No. 10.

### 1) FAILURE TO FULLY CONSIDER EVIDENCE

Lanphere relies on the evaluation of Dr. Poland, the consultative examining psychologist, in an attempt to impugn the ALJ's residual functional capacity assessment. (ECF No. 10 at 4-7). Dr. Poland's assessment of Lanphere's abilities and limitations was more restrictive than the ALJ's ultimate residual functional capacity finding. Dr. Poland opined that "Lanphere would exhibit marked impairment in his ability to make judgments on simple work-related decisions." (R. at 379). The ALJ's assessment precluded only the comprehension and performance of "complex and detailed tasks." (R. at 23). Dr. Poland suggested that Lanphere was "likely to exhibit moderate impairment" in his ability to "interact appropriately with supervisors, co-workers, and members of the general public." (R. at 379). The ALJ determined that while Lanphere was limited to only occasional interaction with members of the general public, his ability to interact with supervisors and co-workers had "no limits." (R. at 23).

In rejecting Dr. Poland's more restrictive assessment, the ALJ relied on the opinion of Murphy, the nonexamining psychological consultant, that Lanphere's ability to work as an emergency medical technician for almost three years was inconsistent with his subjective complaints of disabling mental limitations. (R. at 28, 404). The opinion of a consultative examiner is ordinarily entitled to more weight than the opinion of a nonexamining consultant. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1); *McPherson v. Astrue*, 605 F.Supp.2d 744, 772 (S.D.W.Va. 2008). Under certain circumstances, however, an opinion supplied by a nonexamining consultant can outweigh an opinion provided by a treating or examining source. *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991) ("In light of such conflicting and internally contradictory evidence, the ALJ correctly determined that the opinions of Jones's treating physicians were not controlling.").

In light of the overall record in this case, it was not unreasonable for the ALJ to find Murphy's assessment to be more probative than that of Dr. Poland, the consultative examining psychologist. While it is not clear whether Lanphere lost his job as an emergency medical technician because "there was no work available," or whether he was discharged in response to his seizure, there is nothing in the record which suggests that he was terminated because of the deficiencies highlighted by Dr. Poland. When the ALJ described a hypothetical individual who could perform "simple tasks" but not "complex and detailed tasks," Vocational Expert Phillips testified that such an individual could not perform "any of the ambulance work" required of an emergency medical technician. (R. at 67-68). In this respect, the ALJ found Lanphere's mental abilities to be below the level needed to perform the duties of that position. Even though Lanphere's seizure disorder may have had an adverse impact on his ability to operate an ambulance, it did not render him incapable of working as a general laborer. Since Lanphere had

already exhibited the mental ability to perform duties beyond those required of a general laborer, it was reasonable for the ALJ to credit Murphy's view that Lanphere's mental limitations were not disabling. (R. at 28, 404).

The ALJ buttressed his residual functional capacity assessment by relying on the findings of Dr. Addis, who conducted the court-ordered psychological evaluation in conjunction with the custody dispute over Plaintiff's daughter. (R. at 26). Dr. Addis found Lanphere to be capable of "carry[ing] out instructions, perform[ing] activities within a schedule, attend[ing] to a simple task from beginning to end, sustain[ing] a specific routine, and mak[ing] marginal to fair problem solving decisions." (R. at 289). Admittedly, Dr. Addis' evaluation preceded Lanphere's alleged onset date by three months. Because of its temporal proximity to the period of time at issue, however, that evaluation was probative of Lanphere's ability to work on or after October 7, 2009. *Reilly v. Office of Personnel Management*, 571 F.3d 1372, 1381-1382 (Fed.Cir. 2009) (recognizing the relevance of "noncontemporaneous" medical evidence).

It was the prerogative of the ALJ to credit the assessments of Murphy and Dr. Addis over that of Dr. Poland. *Diaz v. Commissioner of Social Security*, 577 F.3d 500, 505 (3d Cir. 2009)("In evaluating medical reports, the ALJ is free to choose the medical opinion of one doctor over that of another."). That is especially true when the conflicting opinions are viewed in relation to Lanphere's receipt of unemployment compensation benefits. (R. at 29). Moreover, the ALJ gave Lanphere the benefit of the doubt by finding him to be capable of reading only at the level required of a third-grade student. (R. at 23). Dr. Addis indicated that Lanphere was reading at the level of a fifth-grader, spelling at the level of a fourth-grader, and solving arithmetic problems at the level of a seventh-grader. (R. at 288). By finding Lanphere to

have limitations beyond those identified by Dr. Addis, the ALJ partially credited Lanphere's subjective complaints to Dr. Poland. (R. at 23, 378).

Aside from his reliance on the report of Dr. Poland's evaluation, Lanphere does not specifically articulate his reasons for disagreeing with the ALJ's residual functional capacity assessment. (ECF No. 10 at 4-11). In any event, the ALJ's evaluation of Lanphere's work-related abilities and limitations was clearly supported by the record. Lanphere testified that he was not receiving treatment for any cardiac impairments. (R. at 43). The ALJ accommodated Lanphere's mental impairments by limiting his interaction with members of the general public and precluding the performance of "complex and detailed tasks." (R. at 23). Since Dr. Singh, the consultative medical expert, found Lanphere to have no neurological or musculoskeletal deficits, it was permissible for the ALJ to conclude that no exertional limitations were present. (R. at 23, 373).

Dr. Maas, the non-treating medical consultant, of course, opined that Lanphere was limited to medium work. (R. at 383). Since no exertional limitations were identified by Dr. Singh, the ALJ was not required to credit Dr. Maas' opinion. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)(observing that an administrative law judge "may choose whom to credit" when conflicting medical reports are submitted). Even if Lanphere could establish his inability to perform work above the medium level of exertion, the ALJ's decision denying Lanphere's applications for DIB and SSI benefits would not be impugned. Admittedly, Vocational Expert Phillips classified Lanphere's previous position as a general laborer as a job requiring the performance of heavy work. (R. at 65). If Lanphere could perform only medium work, he would not be able to return to his past relevant work as a general laborer. Nonetheless, the ALJ alternatively found that Lanphere could work as an inspector-packer or a line packer. (R. at 68-

69). Phillips classified those jobs as "light"[11] positions. (R. at 68-69).[12] Therefore, the ALJ's alternative findings at the fifth step of the sequential evaluation process are adequate to sustain his decision even if it is assumed that he erred in determining that Lanphere had no exertional limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)(explaining that a remand for further proceedings is not required when the error allegedly justifying the remand "would not affect the outcome of the case").

A vocational expert's testimony cannot be relied upon to establish the existence of jobs in the national economy consistent with a claimant's residual functional capacity unless the question eliciting that testimony incorporates all of the claimant's functional limitations. *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002). Where a credibly established limitation is omitted from an administrative law judge's hypothetical question to a vocational expert, there is a danger that the vocational expert will identify jobs requiring the performance of tasks that would be precluded by the omitted limitation. *Ramirez v. Barnhart*, 372 F.3d 546, 552-555 (3d Cir. 2004). The ALJ's hypothetical question to Vocational Expert Phillips did not include a limitation restricting Lanphere to "only occasional concentration and attendance." (R. at 67). When Lanphere's counsel added that limitation to those previously specified by the ALJ, Vocational Expert Phillips testified that the described individual "would not be employable." (R. at 72). Lanphere argues that the ALJ should have credited the Vocational Expert's testimony in this regard. (ECF No. 10 at 11). The ALJ, however, was not required to adopt every limitation *alleged* by Lanphere. *Rutherford*, 399 F.3d at 554. He was required to adopt only the limitations

---

[11] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

[12] Under the Commissioner's regulations, a claimant who is capable of performing medium work activities is automatically deemed to be capable of performing light work activities. 20 C.F.R. §§ 404.1567(c), 416.967(c).

that were credibly established in the record.  *Id.*  Because Lanphere failed to establish that he was limited to "only occasional concentration and attendance," Vocational Expert Phillips' testimony pertaining to an individual who was so limited did not control the outcome in this case.  *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 206 (3d Cir. 2008).  Although Lanphere believes that the testimony given by him and his brother Atkins at the hearing established the existence of the limitation later articulated by his counsel, the ALJ was not required to credit that testimony.  *Chandler v. Commissioner of Social Security*, 667 F.3d 356, 363 (3d Cir. 2011).

### 2)  REMAND FOR INTRODUCTION OF "NEW EVIDENCE"

Next, Plaintiff argues that he should be entitled to a remand to submit new evidence due to the progressive nature of his condition which has substantially worsened due to a new bipolar disorder diagnosis.

An electroencephalogram performed on January 26, 2011, indicated that Lanphere had "a focal cerebral function disturbance" with a "potential for seizure activity."  (ECF No. 10-1 at 2).  The procedure was performed forty-seven days after the issuance of the ALJ's decision.  Pursuant to the sixth sentence of § 405(g), the Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ."  42 U.S.C. § 405(g).  Lanphere argues that the report of his electroencephalogram constitutes "new evidence which is material" to his condition, and that a remand for further consideration of his claims is appropriate.  (ECF No. 10 at 11).

Evidence is not "new" for purposes of § 405(g) if it is "merely cumulative of what is already in the record." *Szubak v. Secretary of Health & Human Services*, 745 F.2d 831, 833 (3d Cir. 1984). As discussed earlier, however, a previous electroencephalogram performed on Lanphere failed to uncover evidence of "epileptiform discharges." (R. at 331, 349). Since the later procedure yielded abnormal results, it can be fairly characterized as "new" evidence. 42 U.S.C. § 405(g). Therefore, Lanphere's entitlement to a sentence-six remand turns on whether he can satisfy the "materiality" and "good cause" prongs of the statutory framework. *Id.*

The Court has jurisdiction to review only the Commissioner's "final decision" denying Lanphere's applications for DIB and SSI benefits. *Califano v. Sanders*, 430 U.S. 99, 108-109 (1977); *Bacon v. Sullivan*, 969 F.2d 1517, 1519-1521 (3d Cir. 1992). Since the Appeals Council denied Lanphere's request for review, the "final decision" of the Commissioner subject to judicial review is the ALJ's decision of December 10, 2010. *Sims v. Apfel*, 530 U.S. 103, 106-107 (2000). The period of time at issue does not extend to any point subsequent to that date. Referring to "the progressive nature of his condition," Lanphere argues that his seizure disorder "has substantially worsened" since the hearing. (ECF No. 10 at 11). He does not explain whether the alleged "worsening" of his condition occurred during the twenty-four days elapsing between the hearing and the rendering of the ALJ's decision, or whether it occurred after the ALJ's decision had already been issued. Evidence is not "material" if it relates only to "a later-acquired disability" or "the subsequent deterioration of [a] previously non-disabling condition." *Szubak*, 745 F.2d at 833. The electroencephalogram itself, of course, was performed forty-seven days *after* December 10, 2010. (ECF No. 10-1). Because Lanphere cannot demonstrate that his condition deteriorated *before* that date, he cannot satisfy § 405(g)'s "materiality" requirement.

Even if Lanphere could show that the report of his electroencephalogram is "material" to the issues in this case, he makes no attempt to establish that he had "good cause" for failing to incorporate it into the record. 42 U.S.C. § 405(g). The Commissioner's regulations permit a claimant to submit "new and material evidence" to the Appeals Council in support of his or her request for review. 20 C.F.R. §§ 404.970(b), 416.1470(b). The documentary evidence relied upon by Lanphere was available to him around January 26, 2011. (ECF No. 10-1). The Appeals Council did not deny Lanphere's request for review until July 19, 2011. (R. at 1). The report was never presented to the Appeals Council. (R. at 4-5, 261-262). Had Lanphere provided the results of his electroencephalogram to the Appeals Council, it is possible that his request for review would have been granted. *Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). Lanphere makes no attempt to demonstrate that he had "good cause" for failing to incorporate the report into the record between January 26, 2011, and July 19, 2011. For this reason, he cannot establish his entitlement to a sentence-six remand.

In his decision, the ALJ observed that Lanphere remains insured for benefits under Title II through September 30, 2014. (R. at 21). The Commissioner correctly points out that Lanphere can file new applications for DIB and SSI benefits if he believes that his condition deteriorated subsequent to the rendering of the ALJ's decision. (ECF No. 12 at 25).

When an administrative decision is not amenable to "meaningful judicial review," a remand for further proceedings may be required for that reason alone. *Thomas v. Commissioner of Social Security Administration*, 625 F.3d 798, 800 (3d Cir. 2010); *Burnett v. Commissioner of Social Security Administration*, 220 F.3d 112, 119 (3d Cir. 2000). Lanphere argues that various "inaudible" notations contained in the hearing transcript render it "impossible" for the Court to "fairly review the record." (ECF No. 10 at 11). This argument is unavailing. Ambiguities in the

testimonial evidence require a remand only where the relevant "record deficiencies" are "of substance and not of minor detail." *Koning v. Bowen*, 675 F.Supp. 452, 457 (N.D.Ind. 1987). Lanphere makes no attempt to identify testimonial ambiguities that could potentially affect the disposition of this case. (ECF No. 10 at 11). The "inaudible" notations in the transcript "do not make it impossible to comprehend the testimony from its context." *Thomas v. Chater*, 933 F.Supp. 1271, 1275, n. 3 (D.V.I. 1996). Accordingly, a remand for further proceedings is not required.

### G.    CONCLUSION

For the foregoing reasons, it is respectfully recommended that Lanphere's motion for summary judgment (*ECF No. 9*) be denied, and that the Commissioner's motion for summary judgment (*ECF No. 11*) be granted. It is further recommended that the "final decision" of the Commissioner denying Lanphere's applications for DIB and SSI benefits be affirmed. In accordance with 28 U.S.C. § 636(b)(1), the parties have fourteen days to file objections to this report and recommendation. A party's failure to file written objections will seriously impair his ability to challenge this Court's legal conclusions on appeal. *Brightwell v. Lehman*, 637 F.3d 187, 193, n. 7 (3d Cir. 2011).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

cc:    All counsel of record

Sean J. McLaughlin
United States District Judge